IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RACHEL DROZD, | : | Civil No.  1:24-CV-1824 |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | (Magistrate Judge Carlson) |
| | : | |
| FRANK BISIGNANO,[1] | : | |
| Commissioner of Social Security, | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.      Introduction

In the instant case, we are called upon to review a decision by a Social Security

Administrative Law Judge (ALJ) that denied disability benefits to the plaintiff,

Rachel Drozd. The ALJ in this case considered applications both for a period of

disability and disability insurance benefits, (DIB), as well as an application for

supplemental security income, (SSI).[2] Both applications alleged that the plaintiff

---

[1] Frank Bisignano became the Commissioner of Social Security on May 6, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] As explained below in more detail, the fact that the ALJ considered applications for DIB and SSI is relevant because the evidence we find triggered a duty to further develop the record with regard to the plaintiff's mental impairments, i.e. her

1

was disabled as of March 2, 2021, due to an array of physical and mental impairments, including anxiety, depression, and posttraumatic stress disorder (PTSD). As to her mental impairments, although her mental status examinations were frequently unremarkable and she reported some functional activities of daily living, the record also reflects that she reported multiple suicide attempts, had a crisis team sent to her house during the relevant period, and underwent an involuntary psychiatric hospitalization in January of 2024 due to threats of suicide. The ALJ considered evidence of her January 2024 hospitalization in the decision denying benefits but concluded "there was no indication that she was treated on an inpatient basis or that she had attended a partial outpatient program." (Tr. 27). The ALJ then fashioned an RFC for the plaintiff based upon the opinions of two non-treating, non-examining State agency psychiatric consultants who had evaluated the plaintiff's treatment records over two years prior to her involuntary psychiatric hospitalization.

The plaintiff now challenges this decision, arguing, in part, that the mental RFC is not supported by substantial evidence. Since no expert opined on Drozd's mental condition following her involuntary inpatient hospitalization, and the ALJ

---

involuntary inpatient psychiatric hospitalization, occurred over a year after her date last insured. Thus, while the ALJ might not have been required to consider this evidence for purposes of DIB, since the date last insured has no applicability to SSI eligibility, this evidence is relevant to her application for SSI.

fashioned an RFC that did not give adequate consideration to this serious manifestation of her mental impairments, more is needed here before we can engage in an informed analysis of this claim. Therefore, for the reasons set forth below, this case will be remanded to the Commissioner for further proceedings.

## II.     Statement of Facts and of the Case

The administrative record of Drozd's disability application reveals the following essential facts: On January 24, 2022, the plaintiff filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income. (Tr. 17). In both applications, the claimant alleged disability beginning March 2, 2021. (Id.) According to Drozd, she was totally disabled due to the combined effects of the following impairments: Arthritis, Degenerative Disc Disease, Sciatica, Depression, Anxiety, Panic Attacks, Acid Reflux, Back Injury, and "Two Heart Attacks" in January 2021. (Tr. 108). Thus, Drozd's reported impairments were both physical and psychological, however our remand of this case focuses on her emotional impairments. At the time of the alleged onset of her disability Drozd, who was born in 1974, was forty-six years old, which is defined as a younger individual under the Commissioner's regulations. She had at least a high school education and had previously worked in accounts payable and as a shipping and receiving clerk. (Tr. 67).

## A. **Drozd's Clinical History and the Medical Opinion Evidence.**

With respect to Drozd's emotional impairments, the clinical record disclosed that she had been diagnosed with a mood disorder, adjustment disorder with mixed anxiety and depression, and PTSD. (Tr. 1177). Treatment notes indicate her depression and anxiety was tied to her inability to work after suffering a back injury in 2017 and struggling with receiving Worker's Compensation. (Tr. 516, 1757). She also suffered from PTSD both related to her chronic medical issues as well as due to a history of childhood sexual abuse, domestic violence she suffered at the hands of her son's father, and her father's suicide. (Tr. 1180). She attended psychiatric medication management appointments and was treated by various counseling services throughout the relevant period. While treatment notes frequently showed mental status examinations within normal limits, (tr. 1178, 1757, 1763, 1769, 1775, 1783, 1798, 1842), she also consistently reported severe symptoms of depression, anxiety, and PTSD, including persistent nightmares, flashbacks, irritability, and panic attacks, (tr. 1178, 1180-81, 1757), and was frequently tearful during appointments. (Tr. 1178, 1757, 1763, 1769, 1775, 1783, 1798). Shortly before her alleged onset date, her condition was reported as chronic but stable and treatment notes indicated she had some stability in her symptoms. (Tr. 513-561). Yet, on the alleged onset date, she rated her anxiety and depression as 10/10 and she reported

4

having two heart attacks in January 2021 that the doctor told her were stress-related. (Tr. 526). In September 2021 her treating provider, Children's Service Center called 911 to report she had reported suicidal ideation and a plan. (Tr. 557). Drozd testified at the hearing that she stopped attending Children Service Center after she "wasn't in the mood" to speak with her counselor so they sent the police to her house. (Tr. 64).

After discontinuing treatment with CSC, Drozd attended treatment at Community Counseling Services and the Aaron Center in 2022 and 2023. Although her mental status examinations continued to be within normal limits, (tr. 1178, 1757, 1763, 1769, 1775, 1783, 1798, 1842), psychiatric evaluations in both 2022 and 2023 revealed she was experiencing significant and debilitating mental health symptoms. At an evaluation in March 2022, she reported being unable to sleep at night, stated she felt she had severe anxiety and "cannot get anything done," never finished what she started, cried often, felt she was not keeping up, and experienced nightmares and racing thoughts. (Tr. 1180-81). A September 2023 Aaron Center also reflected severe psychological symptoms, stating she "continues to experience severe symptoms of PTSD on a very consistent basis . . . that are very difficult for her to control at this time. She often has flashbacks nightmares, distressing memories on a regular basis." (Tr. 1834). At the time, she reported engaging in biweekly therapy

sessions but that "she continues to experience all symptoms on a very severe level." (Tr. 1835). The symptoms of her PTSD manifested as sleep disturbance, problems with concentration, hypervigilance, irritable behavior, markedly diminished interest or participation in significant activities, persistent negative emotional state, difficulty experiencing positive emotions, irritable behavior, and thoughts of detachment or estrangement from others. (Tr. 1841). Her therapist noted the symptoms of her PTSD causes clinically significant distress or impairment in important areas of functioning. (Tr. 1845). Nonetheless, her mental status examination results were largely within normal limits. (Tr. 1842). Thus, the record throughout the relevant period and beyond indicates that her mental health was deteriorating and her condition worsening despite some objective examination findings remaining stable.

Moreover, although the clinical record is vague, there are multiple mentions throughout the relevant period and beyond, that Drozd was suicidal. Her suicidal thoughts were first indicated in September 2021 when her provider reported "911 was called due to [suicidal ideation] and a plan." (Tr. 557). Northeast Counseling Services notes from 2022-2023 report that she tried to overdose twice in 2020 and 2021. (Tr. 1775). She reported to another provider that she had attempted to overdose in 2022 but stated she just vomited all the pills back up. (Tr. 1790). In 2023 she

6

reported passive/fleeting thoughts of self-harm and that she had thoughts of hurting herself but thinking about her pets stops her from doing anything. (Tr. 1783). In June 2023 she stated, "there's just nothing to be happy about." (Tr. 1790). Then, in January 2024, it appears Drozd was involuntarily psychiatrically hospitalized for ten days after making suicidal statements.[3] (Tr. 2318-2320). Notes state she reported being stressed and taking her Seroquel for sleep and not remembering the events of the night, but that she was told she said she did not want to live and was taken to the ED. (Id.)

Against this medical backdrop which seemed to show Drozd's mental state worsened from the date of her application through the date of the ALJ's decision, the only two experts who opined on Drozd's mental abilities were two state agency non-examining, non-treating sources who reviewed the plaintiff's medical records early in the latest disability adjudication, in May and November 2022. On initial review, Dr. Lisa Marie Cannon opined that Drozd had mild impairments in her

---

[3] The record of this hospitalization is slim but does state her admission date and expected end date ten days later, though detailed treatment notes are not included in the record beyond intake notes. (Tr. 2318-20). The ALJ stated there was no evidence she actually underwent this inpatient hospitalization, but the nature of an involuntary hospitalization lends itself to the assumption that she was not free to leave. Nonetheless, as explained below, the enigmatic nature of this hospitalization coupled with the absence of any opinion on her clearly deteriorating mental state compels further development of the record.

ability to understand, remember, or apply information and adapt or manage oneself, and moderate limitations in her ability to interact with others and concentrate, persist, or maintain pace. (Tr. 111). Dr. Cannon concluded the plaintiff could understand, retain and follow one and two-step instructions and could meet the demands required for basic tasks on a sustained basis. (Tr. 112). On reconsideration in November 2022, Dr. Susan Malkoff Schwartz opined similarly to Dr. Cannon except she concluded Drozd had moderate limitations in her ability to adapt or manage oneself. (Tr. 131). Dr. Malkoff Schwartz repeatedly mentioned statements in the record where Drozd denied suicidal ideation but ignored notes from the same period which stated she had tried to overdose multiple times. Both opinions were also issued prior to Drozd's involuntary inpatient hospitalization in January 2024. In fact, no treating source opined on Drozd's mental RFC following her most recent application. The only treating source who did opine on her ability to perform work-related activity, her treating pain management provider, concluded she would be absent in excess of allowable limits. (Tr. 1824).

Thus, these medical opinions, which were issued prior to Drozd's 2024 involuntary psychiatric hospitalization, recommended mild to moderate limitations in all areas of mental functioning but made no accommodations for her significant history of suicidal ideation and her reported suicide attempts.

It was against this medical backdrop that the ALJ came to hear Drozd's case.

## B. **The ALJ Hearing and Decision**

A disability hearing was conducted in this case on October 19, 2023, at which Drozd and a vocational expert testified. (Tr. 38-72). The hearing was conducted prior to Drozd's involuntary commitment in January 2024, but, when questioned by the ALJ about any history of psychiatric hospitalization, she explained inpatient psychiatric hospitalization had been recommended to her by her cardiologist because of stress related heart palpitations and her 2021 heart attacks. (Tr. 57). Drozd explained that she had contacted psychiatric hospitals but they recommended she go to the emergency room with symptoms. (Id.) She also testified that she was in a specialized PTSD treatment at the Aaron Center and that she was experiencing flashbacks, trouble sleeping off her medication, and difficulty being around people. (Tr. 62, 64). A vocational expert also testified that an individual who would be off task 20% of the workday, would be late, absent or need to leave work at least two days per month, and would need unscheduled breaks throughout the workday would be unemployable. (Tr. 69).

Following the hearing, on January 30, 2024, the ALJ issued a decision denying Drozd's application for benefits. (Tr. 14-37). In that decision, the ALJ first concluded that Drozd met the insured status requirements of the Act through

9

December 31, 2022, had not engaged in substantial gainful activity since March 2, 2021, the alleged onset date. (Tr. 19-20).  At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Drozd had the following severe impairments: left food osteoarthritis, degenerative joint disease of the pubic symphysis and hips, degenerative disc disease of the cervical spine and lumbar spine, lumbar radiculopathy, major depressive disorder, generalized anxiety disorder, and posttraumatic stress disorder. (Tr. 20). At Step 3, the ALJ determined that Drozd did not have an impairment or combination of impairments that met or medically equaled the severity of one of the disability listing impairments. (Tr. 21-25). In considering her mental impairments, the ALJ adopted the limitations opined by Dr. Malkoff Schwartz that the plaintiff had mild limitations in understanding, remembering, or applying information and moderate limitations in all other areas of mental functioning. (Id.) Between Steps 3 and 4, the ALJ then fashioned a residual functional capacity ("RFC") for the plaintiff which considered Drozd's impairments as reflected in the medical record, and found that:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except the claimant can occasionally perform pushing or pulling motions with the lower extremities, such as operating pedals and foot controls. She can occasionally stoop, crouch, kneel, use ramps, and climb stairs. She can perform jobs that do not require crawling, balancing, or climbing

10

ladders, ropes, or scaffolding. She can tolerate occasional exposure to extreme cold and vibrations, and can perform jobs that do not require exposure to workplace hazards, such as unprotected heights and dangerous, moving machinery. She can perform jobs that would take no more than 30 days of training to learn with a specific vocational preparation level of two (SVP 2), which are generally classified as unskilled. She can understand, remember, and carry out simple instructions. She can perform simple, routine, and repetitive tasks. She can perform jobs that would be considered "low stress" in that they would involve only occasional, simple decision making, and only occasional, gradual changes in the work duties and work setting. She can have occasional interaction with coworkers, supervisors, customers, and members of the general public.

(Tr. 25).

This RFC clearly accounted for some limitations in mental functioning in a number of aspects opined by the state agency experts. But the analysis was flawed in that it overlooked gaps in the evidence particularly with regard to Drozd's involuntary inpatient hospitalization that occurred very shortly before the issuance of the ALJ's opinion. Moreover, the ALJ's analysis glossed over repeated indications in the record that Drozd's mental health had deteriorated since the opinions issued by the state agency experts. On this score, the ALJ summarized her treatment records in the following way:

The claimant also presented during the relevant time period with symptoms of and for treatment for the following severe mental impairments: Major Depressive Disorder; Generalized Anxiety Disorder; and Posttraumatic Stress Disorder. In January of 2024, after her hearing, she was admitted to an inpatient psychiatric unit due to

11

suicidal thoughts, there was no indication that she was treated on an inpatient basis or that she had attended a partial outpatient program. (Exhibit B25F). However, prior to that time, her treatment was conservative and routine. She attended mental health treatment by way of medication management appointments and therapy appointments throughout the relevant time period. Moreover, mental status examinations have revealed that while she has had variations in mood and affect, her other findings have generally been within normal limits, noting she has had a normal appearance, normal speech, normal language, normal attention and concentration, normal thought processes and content, normal cognitive abilities, intact memory, no suicidal ideations, full orientation, a clear sensorium, a normal fund of knowledge, and fair to good insight and judgment. (Exhibits B7F/ 1- 25; B8F/ 1- 25; B12F/ 1-16; B13F/ 1-44; B16F/ 1-25; B19F/ 1-50; B23F/ 1-38).

(Tr. 27). Thus, the ALJ acknowledged the records from Tower Behavioral Health showing she had been involuntarily committed for suicidal statements but, for some reason, stated there was no indication she was treated on an inpatient basis. The ALJ also characterized her prior treatment as conservative based upon normal mental status examinations but did not specifically acknowledge the increasingly concerning statements made by the plaintiff throughout 2022 and 2023, the severity of her reported symptoms as characterized by her treating providers, or her reports that she repeatedly attempted to overdose on medication.

As to the medical opinion evidence, the ALJ found the opinions of Dr. Cannon and Dr. Malkoff Schwartz consistent with the medical evidence including her routine treatment history "other than one inpatient admission in January of 2024," and

12

normal mental status examinations throughout the record and was supported by her ability to perform some activities of daily living. However, the ALJ adopted the more conservative "paragraph B" limitations of Dr. Malkoff Schwartz that the plaintiff had moderate limitations in adapting or managing oneself.[4] In crediting these opinions, while the ALJ did mention the plaintiff's 2024 hospitalization more as an anomaly, the ALJ did not explain how this significant development in the plaintiff's condition could be reconciled with the benign opinions of these experts.

The ALJ then concluded that considering her age, education, and RFC, there were jobs that existed in the significant numbers in the national economy that Drozd could perform and thus found she had not been under a disability during the relevant period. (Tr. 30-32).

This appeal followed. (Doc. 1). On appeal, Drozd argues, in part, that the RFC formulated by the ALJ is not supported by substantial evidence because it failed to account for all of her well-established limitations. Because we find that the ALJ failed to fully develop the record with regard to the deteriorating nature of her mental

---

[4] Irrelevant to the reason we remand was the ALJ's treatment of the opinions of these experts' opinions that the plaintiff was capable of performing one to two-step tasks. This is an issue on which we have frequently remanded but which, in this case, the ALJ's explanation could serve as an example of how an ALJ could be successfully navigated.

13

health symptoms culminating in her involuntary hospitalization, we will remand this case for further consideration by the Commissioner.

## III. Discussion

### A. Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision]

14

from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is

15

supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his

16

decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000).

As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009). Further, it is clear that this duty of articulation extends to analysis of a claimant's mental and emotional limitations. See generally Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim made here, based upon alleged inadequacies in the articulation of a claimant's mental RFC. In Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019), the United States Court of Appeals recently addressed the standards of articulation that

17

apply in this setting. In Hess the court of appeals considered the question of whether an RFC which limited a claimant to simple tasks adequately addressed moderate limitations on concentration, persistence, and pace. In addressing the plaintiff's argument that the language used by the ALJ to describe the claimant's mental limitations was legally insufficient, the court of appeals rejected a *per se* rule which would require the ALJ to adhere to a particular format in conducting this analysis. Instead, framing this issue as a question of adequate articulation of the ALJ's rationale, the court held that: "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.' " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019).

In our view, the teachings of the Hess decision are straightforward. In formulating a mental RFC the ALJ does not need to rely upon any particular form of words. Further, the adequacy of the mental RFC is not gauged in the abstract.

18

Instead, the evaluation of a claimant's ability to undertake the mental demands of the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

### B.  Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in

substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a

20

decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate

21

the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in

22

engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

It is against this backdrop that we evaluate the decision of the ALJ in this case.

E.    **This Case Will be Remanded.**

On appeal, the plaintiff challenges various aspects of the mental RFC evaluation by the ALJ in this case. In our view, the specific issues raised by the plaintiff highlight a broader concern with regard to the ALJ's evaluation of the evidence of the plaintiff's mental impairments. After a review of the record, we conclude that the plaintiff's involuntary hospitalization prior to the unfavorable decision was not given adequate consideration and further development of the record was needed here.

At the outset, we note that we have regularly remanded in the past where an ALJ has failed to account for or discuss evidence of a plaintiff's suicide attempt or suicidality. See Hoffman v. Bisignano, No. 4:24-CV-507, 2026 WL 711547, at *3 (M.D. Pa. Mar. 13, 2026); Glaser v. Bisignano, No. 4:23-CV-1922, 2025 WL 3124700, at *2 (M.D. Pa. Nov. 7, 2025); Folks o.b.o. Folks v. Bisignano, No. 1:22-CV-1803, 2025 WL 2983162, at *2 (M.D. Pa. Oct. 22, 2025). Thus, the fact that the plaintiff was involuntarily committed for suicidal statements immediately before the ALJ issued his decision in this case calls for further inquiry into the deterioration of the plaintiff's mental condition.

Beyond this threshold concern relating to Drozd's reported suicidality, we remand based upon the intersection of several well-settled tenets of Social Security

24

practice. First, it is important to note that the most severe manifestation of the plaintiff's mental impairments, her involuntary hospitalization which highlighted other indications of suicidality throughout the record, occurred after the date last insured (DLI). Indeed, the plaintiff was only insured for disability benefits through December 31, 2022, and her hospitalization occurred one year later in January 2024. This is significant since "[i]f a claimant becomes disabled after losing insured status, h[er] DIB claim will be denied despite a disability," while eligibility for SSI does not have a date of last insurability requirement. McClain v. Comm'r, Soc. Sec. Admin., 676 F. App'x 935, 937 (11th Cir. 2017); 20 C.F.R. §§ 416.330, 416.335. Thus, if the ALJ was only considering an application for disability insurance benefits, the ALJ need only consider medical records prior to the date of last insured. Cardinal v. Colvin, No. CV 14-1368, 2016 WL 1237783, at *5 (E.D. Pa. Mar. 30, 2016) (citing Ortega v. Comm'r of Soc. Servs., 232 F. App'x 194, 197 (3d Cir. 2007) (holding that the ALJ need not consider medical evidence "after [the] last insured date)).

But, in the instant case, the plaintiff applied for both DIB and SSI. On this score, "[w]hile the DIB determination is a historic, backward-looking assessment of Plaintiff's medical conditions from the alleged disability onset date to the date of last insured, the eligibility for SSI starts on the date of the SSI application," and assesses

25

the plaintiff's disability through the date of the ALJ's decision. LISA M., Plaintiff, v. COMMISSIONER OF SOCIAL SECURITY, Defendant., No. 2:25-CV-00430, 2026 WL 1074111, at *4 (S.D. Ohio Apr. 20, 2026) (citing 20 C.F.R. §§ 416.330, 416.335; Koster v. Comm'r of Soc. Sec., 643 F. App'x 466, 478 (6th Cir. 2016) (explaining that SSI is not retroactive and the relevant timeframe for assessing SSI eligibility is the date the SSI application was filed to the date of the ALJ's decision)). Thus, all records through the date of the ALJ's decision were relevant to the SSI analysis. Moreover, while an ALJ is not required to evaluate evidence after the date last insured for DIB purposes, an ALJ "can . . . consider evidence after Plaintiff's date last insured . . . if it pertains to Plaintiff's condition during the relevant period." Demsko v. Kijakazi, No. CV 22-876, 2023 WL 6128954, at *1 (W.D. Pa. Sept. 19, 2023) (citing Ortega v. Comm'r of Soc. Sec., 232 Fed. Appx. 194, 197 (3d Cir. 2007)). Indeed, other circuits have held that retrospective consideration of evidence is appropriate where there is a link between the final condition of the claimant and his earlier symptoms. Bird v. Comm'r of Soc. Sec. Admin., 699 F.3d 337, 341 (4th Cir. 2012) (citing Moore v. Finch, 418 F.2d 1224, 1226 (4th Cir. 1969)).[5]

---

[5] To be clear, although the ALJ may not have been required to address evidence of the plaintiff's involuntary hospitalization which occurred one year after the date last insured for purposes of the DIB application, in light of the additional evidence of the plaintiff's ongoing suicidal tendencies during the relevant period which appear to

Here, the longitudinal records show a significant deterioration in the plaintiff's mental health which culminated in her January 2024 involuntary committal for suicidal statements. In our view, the ALJ paid insufficient credence to this severe manifestation of the plaintiff's mental impairments and characterized the hospitalization in a way that was not entirely supported by the record. First, while the ALJ concluded that there was no evidence the plaintiff engaged in this inpatient treatment, the nature of involuntary committal lends to the conclusion that she, indeed, completed a ten-day treatment at Tower Behavioral Health although we agree that the records presented by the plaintiff are slim. But there is simply not enough evidence in the record to support the ALJ's conclusion that she never engaged in any inpatient treatment.

Moreover, the ALJ's characterization of her prior mental health treatment as conservative fails to accurately capture the extent of her mental impairments and give appropriate consideration to how the 2024 hospitalization could have been linked to these earlier symptoms. Indeed, while, as the ALJ points out, her mental status examinations were frequently within normal limits, her mood was also

---

have manifested in her hospitalization post-DLI, we find more development of the record is appropriate as to both her DIB and SSI claims but make no conclusions as to whether the subsequent evidence is indicative of a disability during the relevant period.

27

regularly depressed and she was tearful during appointments, (tr. 1178, 1757, 1763, 1769, 1775, 1783, 1798); in September 2021 her psychiatric provider sent the police to Drozd's home stating "911 was called due to [suicidal ideation] and a plan;" she reported to two psychiatric providers that she tried to overdose in 2020, 2021, and 2022, (tr. 1775, 1790); she reported suicidal thoughts in 2023, (tr. 1783); and a September 2023 evaluation stated she "continues to experience severe symptoms of PTSD on a very consistent basis . . . that are very difficult for her to control at this time," and reported that "she continues to experience all symptoms at a very severe level." (Tr. 1834-35). In our view, although the inpatient hospitalization occurred after the date last insured, the ALJ did not adequately address this significant and material evidence, particularly in light of the other evidence during the relevant period that Drozd was suicidal. This was error since it is well-settled that a remand is necessary when an ALJ's opinion ignores or fails to address material evidence supporting a disability claim. See Morales v. Apfel, 225 F.3d 310, 312 (3d Cir. 2000). This principle applies with particular force when an ALJ has "ignored competent medical evidence regarding psychological disability in favor of his own contrary conclusion." Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1154–55 (3d Cir. 1983).

More specifically, it is generally conceded that an unexplained failure by an

ALJ to fully acknowledge or address evidence of suicidal impulses by a disability claimant compels a remand. See, e.g., Salazar v. Barnhart, 468 F.3d 615, 622 (10th Cir. 2006); Roat v. Barnhart, 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010). As one court has aptly observed in this regard: "Due to the ALJ's simultaneous silence as to a suicide attempt and reliance on progress notes containing a claimant's denials of suicidal ideations close in time to the suicide attempt, the Court is unable to conclude that the ALJ considered Plaintiff's medical condition as a whole or applied the appropriate legal standards." Lewis v. Colvin, No. 14-14495-CIV, 2016 WL 4810585, at *3 (S.D. Fla. Mar. 4, 2016). These standards apply here and compel remand.

In our view, the plaintiff's hospitalization immediately prior to the issuance of the decision by the ALJ, coupled with the treatment notes throughout the relevant period indicating her condition was worsening, at least required the ALJ to further develop the record with regard to how the plaintiff's mental impairments affected her ability to perform work-related activity. This is particularly true since the ALJ's decision relied exclusively upon state agency opinions issued at the outset of the administrative process, paying insufficient deference to the familiar proposition that:

> [C]ase law ... cautions courts to take into account the fact that state agency non-treating and non-examining source opinions are often issued at an early stage of the administrative process. While this fact,

29

standing alone, does not preclude consideration of the agency doctor's opinion, see Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011), it introduces another level of caution that should be applied when evaluating reliance upon such opinions to discount treating and examining source medical statements.

Therefore, where a state agency non-treating and non-examining opinion does not take into account material medical developments which have occurred after the opinion was rendered, that opinion often cannot be relied upon by the Commissioner to carry its burden of proof. See Batdorf v. Colvin, 206 F. Supp. 3d 1012, 1023 (M.D. Pa. 2016).

Foose v. Berryhill, No. 3:17-CV-00099, 2018 WL 1141477, at *7 (M.D. Pa. Mar. 2, 2018). Indeed, while the opinions of state agency consultants "merit significant consideration," Chandler, 667 F.3d at 361, "[a]s a matter of law and common sense, material medical developments which take place after a state agency or consulting expert's review of a claimant's file frequently can undermine the confidence which can be placed in this non-treating and non-examining source opinion." Dieter v. Saul, No. 1:19-CV-1081, 2020 WL 2839087, at *8 (M.D. Pa. June 1, 2020). Thus, when additional medical records show that the claimant's condition and functional capacity appear have deteriorated in the period between the consultants' opinions and the ALJ's decision, this Court and others have concluded that the medical opinions do not constitute substantial evidence and have remanded the case for further proceedings. Garcia v. Dudek, No. 1:24-CV-00194, 2025 WL 674226, at *9–10 (M.D. Pa. Mar. 3, 2025) (collecting cases). On the contrary, where an ALJ

30

discusses the additional medical evidence, "consider[s] [the opinion] in the context of the full record," and reconciles these records with the opinion upon which the ALJ relies, this Court has concluded that the ALJ does not err in considering the opinion. Hill v. Saul, No. CV 3:19-364, 2020 WL 3547437, at *2 (M.D. Pa. June 30, 2020).

Here, the ALJ simply did not engage in any analysis of how the plaintiff's 2024 involuntary hospitalization could be reconciled with the opinions of the state agency experts which also did not address her suicidal tendencies. Moreover, given the evidence that Drozd's impairments were exacerbated in the years leading up to the ALJ's decision, the ALJ had a duty to develop the record to determine how these impairments affected the plaintiff's ability to work. Plummer v. Apfel, 186 F.3d 422, 434 (3d Cir. 1999) ("The ALJ has a duty to develop the record when there is a suggestion of mental impairment by inquiring into the present status of impairment and its possible effects on the claimant's ability to work."). Furthermore, when it is given that a claimant has a clear history of depressive symptoms, an "ALJ fail[s] in her duty to develop the record when she d[oes] not order a consultative examination." Id. at *6.

In this case it is clear that Drozd has a significant history of severe depression anxiety, and PTSD. Moreover, the evidence before the ALJ demonstrated that, since

31

the medical experts had issued their opinions, significant developments had occurred with regard the manifestation of Drozd's mental health symptoms, specifically, she was involuntarily committed in January 2024. In our view, the proper exercise of discretion in terms of fulfilling the ALJ's duty to develop the record required some further neutral evaluation of the plaintiff's mental state. The failure to fill this evidentiary void constituted a failure to develop the record which now compels a remand.

Given the ALJ's failure to address material evidence in the record, coupled with an RFC that has no anchor to any expert opinion as to what limitations Drozd's impairments would require, more is needed here. Thus, we conclude that the ALJ's decision in this case is not supported by substantial evidence. Accordingly, we recommend that this case be remanded to the Commissioner for further consideration of this evidence. Yet, while we reach this conclusion, we note that nothing in this Report and Recommendation should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be. Rather, that task should remain the duty and province of the ALJ on remand.

## IV. <u>Conclusion</u>

Accordingly, for the foregoing reasons, the plaintiff's request for a new administrative hearing is GRANTED, the final decision of the Commissioner

denying these claims is vacated, and this case is remanded to the Commissioner to conduct a new administrative hearing.

An appropriate order follows.

_s/ Martin C. Carlson_
Martin C. Carlson
United States Magistrate Judge

DATED: May 14, 2026